All right, thank you. The first case that we'll hear is United States v. Jackson. This is 25-11-47, and we'll hear from Mr. Luhlmann. Thank you, Your Honor. May it please the Court, my name is Justin Luhlmann, and I represent the appellant, Aaron Jackson. The issue in this case is whether officers had reasonable suspicion to believe that Mr. Jackson was engaged in an open-air drug transaction at the time they stopped his vehicle in a parking lot outside of a bus stop. The District Court found that they did, based principally on four facts. We challenge certain of those factual findings on appeal, but also argue that even if those facts stand, they do not add up to reasonable suspicion. And that is where I would like to start today, and if time permits, I'll address our factual challenges. Of the four facts that the Court relied on, there's really two of them that are doing most of the work. The other two can be addressed more quickly. The first of those was that this was in a high-crime area, the time and location of the stop. We've always said that is a factor, it's just not sufficient. Isn't that true? That is exactly correct, Your Honor, and I think all sides are in agreement on that, that that is not sufficient in and of itself. Individuals who live in high-crime areas aren't second-class citizens when it comes to their Fourth Amendment rights, and so that is, at most, a relevant contextual consideration. Moving on, the second factor the Court noted was that this vehicle was backed into a parking space. It was reverse parked. An officer heard testified that in his view, in his experience, that was suspicious and indicative of criminal activity because it would allow somebody who was engaged in a drug transaction to easily escape. Your Honor, reverse parking is a common... I'm sorry, counsel, I can't hear you. I apologize, Your Honor. You don't have the best sound system here. I'll try to speak up and speak a little more slowly. Are you able to, Kevin, is he able to raise that? I don't think he can raise it. Yeah, it's, you know. You may have to lower yourself down. Is this any better, Your Honor? Could you be any shorter? I'll do my best. How about on your knees in a supplication position? We'll give you more time for the antics. So the second factor was that this car was backed into a parking space. It was reverse parked. Again, the officer testified that that was suspicious in his view because it suggested the individual was engaged in a drug transaction and wanted an easy escape. Let me push back on that a little bit. Generally speaking, I don't think anybody would quarrel with that proposition. If you're going to the Roswell shopping mall and there's a lot of traffic, you may want to try to get out. Now, if you're going to a deserted bus stop where there's no buses, the check-cashing store would be closed for hours, one would wonder why would you be so worried about changing your parking so that you could get out quickly when there's nobody there. Your Honor, I still believe at the end of the day it's just a common method of how individuals park. We cite the case Fifth Circuit Decision in Hill. That case was, again, a stop late at night. It was at 11 p.m. in a high-crime area. And the officer then in that instance again noted, well, this car was reverse parked, and that was suspicious to me. And the Fifth Circuit walked through the analysis and said, look, this is just a common everyday method of parking. I mean, even this morning, I understand your point as to the time, but even this morning going into Starbucks I see a police cruiser reverse parked at Starbucks. I count nine cars in the hotel parking lot at my hotel reverse parked. I think based on Hill and these other cases it's a common method. It doesn't really contribute much. Don't we take into account all of the facts, where it was, what the area was like, just everything, not just two facts? No, of course, Your Honor. Yeah, I want to walk through the other two. The third and fourth facts were really the more significant facts here. So the third of those was the bystanders around the vehicle. Officers testified when they arrived on the scene. There were three to four individuals in the parking lot, generally around the tracks, the Chevy tracks. And as they arrived, those individuals moved or separated themselves from the vehicle. And Officer Moran further clarified that those individuals then gravitated to the immediately adjacent bus stop, so a bus stop about 10 feet away. A couple of points I want to make about all this. Are they waiting for the bus that was never going to come? Your Honor, that's not in the record. I don't know what exactly. But either way, there's no testimony here that any of these individuals fled or ran from the scene. There's the officers. There wasn't any testimony as well as to whether or not they actually witnessed any direct interaction between Mr. Jackson in the backseat and these individuals around the car. The testimony was that they just pulled up, saw these individuals there, and saw these individuals gravitate towards the bus stop. And I think that really distinguishes this case from a lot of the cases the government cites in its brief. The government says that this looked like a drug deal. The officers witnessed something that looked like a drug deal. But all the cases the government relies on involved more direct interaction. How do you define gravitate toward? They didn't hang around. They were moving out of their… Well, the term that Officer Moran used, he used the term that they gravitated towards the bus stop. So I'm just using his terminology. There's no testimony that they hightailed it or ran out of the… They just shuffled along. Yeah, the testimony was the term they used was separated or moved from the vehicle or gravitated. I think those were the three terms the officers stuck with. We're hearing an officer who has some background and expertise in suspicious behavior. So even though this isn't a very compelling factor, don't we have to say that it is a legitimate factor for an experienced officer who says, I know suspicious circumstances when I see them, and that was a little suspicious to me? Your Honor, if it factors, I think it factors very lightly here. But a factor, but you just crawl with the weight. Yeah, I would argue. I mean, it's one of those I think we could argue whether it factors not at all or very minimal. But I think it's certainly in that vein. You know, this court recently in its decision in Huerta noted, in that case, it was, again, the Denver Police Department saying that it was suspicious that an individual was gravitating from their car to walk into a convenience store. And there this court said, look, that's that's everyday conduct. That's not suspicious here. We don't have a convenience store, but we also don't have anybody engaged in headlong flight away from the vehicle. And this court has said before in Daniels and in Davis and Dell and Briggs that simply walking away when police officers arrive on the scene is not suspicious conduct. And in not sticking around to engage with the officers is also not protected. What is is quickly dispersed, which is what the district court found the same as slowly walked away. Your Honor, the officers, I believe, and I recall that language from the opinion as well. The officers, I think, testified that they immediately separated. But there's no testimony. I mean, that's to me a method of describing their reaction. They see the officers and they move. But there's no testimony in the record at all as to the pace which which which with they move. And in either event, they moved about 10 feet to the bus stop nearby. And so it's I think under all those factors, even if they took two quick steps or two medium steps, it's still not they're not fleeing the scene. It seems to me that one of your one of your arguments there is two in the morning. High crime scene. The last thing the spectators who are out in a parking lot will want is any kind of engagement with an officer, whether they're really completely clean of any activity or not. They simply don't want interaction. So the fact they migrated away, I think that is probably the absolute least probative effect on behalf of the government. I'm not saying it's zero, but it certainly is very understandable why almost even very innocent people would say two in the morning, man, I don't want to be talking to a cop. I would agree with that, Your Honor. I think this I think this court's decision in Davis is kind of guiding principle on that proposition there. The officers stopped an individual who was pulled up to what the court described as a known criminal establishment. It was a bar that sold liquor without a license. It was a common hangout place for multiple gangs. The officers had encountered multiple shootings and and drug transactions in that neighborhood. The defendant was observed getting out of a vehicle, and he saw the officers made eye contact with them, broke that eye contact and started walking towards the establishment with his hands in his pockets. And when officers tried to shut him down and say, excuse me, sir, I want to speak with you. He just kept walking. And then eventually officers detained him. And this court in Davis said that that is not suspicious conduct. Not wanting to engage with an officer and simply going about your business is not suspicious conduct. So I would agree with you, Judge Bell. The final fact I want to touch on, I think the biggest fact that the district court relied on that the officers relied on were these furtive movements. And in evaluating this factor, I think the important thing is to really take away some of these conclusory and vague labels that are assigned and look at the specific articulable conduct that these officers encountered. That's that's the standard under this court's case law. And here the officers, as the government, I think it kind of acknowledges in its response. The officers had a hard time really describing in detail what it was they witnessed. Officer Moran testified that he saw a lot of movement in the car. Officer Heard testified that the movements weren't normal and that the defendant seemed to be kind of moving throughout the vehicle. But when you actually look at what is the specific conduct that both of them agreed on that the district court credited, it was that the defendant was engaged in a ducking or crouching motion in the backseat. And that that happened as the officers were shining their spotlights in the front of the vehicle. Well, that's partially true. Officer Moran did say that in his in his statement. That in his statement, when at the suppression hearing itself, Officer Moran testified and both he and Officer Heard both testified that they saw the furtive movements when they had turned not this. Their light when they when Officer Moran came in and contacted the three individuals in the vehicle. But when they turn on all of the lights on the vehicle and as soon as they pulled in into the parking lot, both officers testified that they saw these movements. That's that's my my reading of the testimony as well. Your Honor, I think there's some ambiguity points where they're referring to spotlights or overhead lights or area scene lights. But yes, I would agree. And so, again, if we're evaluating this based on the specific articulable conduct and we're looking at it in context and from the perspective of an objective officer, these these actions are really quite ambiguous. Well, is that fatal to your argument? Because we view the evidence of the light most favorable to the ruling or to the government as the case may be based on our case law. There are findings that the district court made that that Mr. Jackson was trying to duck under the under the head seat under the seat in the front so that he couldn't be seen. And if there's ambiguity in the testimony and we view the evidence favorably to the ruling, does that combine to preclude your argument? Let me let me clarify what I'm what I'm saying that it was ambiguous. I'm saying the inference be drawn from those objective facts that the officers witnessed. And in that case, this court, while it reviews historical facts for clear error, whether whether those facts were suspicious in this context is something that this court reviews de novo, giving deference when appropriate to the to the officers judgment. But simply because the officers say that they believed it was evasive isn't enough. You actually have to look at the specific concrete facts that the officers saw. And if you look at this court's case law on on furtive gestures or furtive movements, the cases, many of which the government sites all involved conduct that was much more indicative of an intent to conceal. So, for example, in this year, it was the defendant tucking his hands into the middle of a car seat as officers were walking up in one of the other cases. I believe it was McGregor officers turned on their their lights to start this stop. And the defendant dramatically leaned all the way over into the passenger seat to reach for something just as the stop was being initiated. Here we have the defendant having a spotlight shined in the front windshield of his vehicle bending down or crouching down. As we cite, we cite Ninth Circuit decision that notes when when officers basically shine their spotlights in your front windshield, it's normal for a person to conceal their face to try to cover their eyes, especially when it's pitch black outside. That's the same circumstance we have here. There's nothing in this this context to suggest that that it's not merely on the same side of the line as this year or McGregor or Canada, which involved conduct that was far more indicative of an intent to conceal. And I say I have about a minute of my time. I'm going to reserve the remainder of my time for all right. And Kevin, why don't you give him 45 seconds for Thank you. Thank you. And before you start, you might just adjust. There you go. May please the court, Marissa Miller on behalf of the United States. This court should affirm because the police officers here had the reasonable suspicion required to conduct what was a brief investigative detention. When it comes to reasonable suspicion, we look at the totality of the circumstances, the big picture. And we ask whether law enforcement had particularized objective reasons to suspect criminal activity was afoot. The officers in this case were patrolling an area of Denver very late at night. That was that had essentially become notorious that summer for both drug deals and other violent crimes. They saw a white SUV with about three to four people around it, but it was two in the morning. So there was nothing open. The buses weren't running. The store that was serviced by the parking lot was closed. And based on this, they thought that this could be a drug deal. When they pulled in for a closer look, two more things happened. That group of people immediately dispersed when they saw the police coming and the person in the backseat who was Mr. Jackson began making strange movements as though he were trying to hide himself or perhaps contraband like a gun or drugs. Taking all of these things together, it was reasonable for these police to suspect that something criminal might be taking place here. What is the probability figure on what is reasonable? Because if a bright light is shined on me, I would try to keep my eyes out of it because it would be blinding in the middle of the night. And I would be against the sea. And so I just I'd like to know, is it 50 percent, 51 percent, 30 percent? What percentage likelihood do you have? I think I'm obviously reluctant to assign a number to it. The courts are absolutely resistant to putting a number on that because I guess we like the flexibility. But what what would you say? I mean, I think that it is probably slightly above 50 percent. I can see that being a reaction. But, you know, here we don't just have we have some facts that I think count against that. One is that we have these two women in the front seat who are obviously getting far more exposure to that light. And their reaction is not to duck down and start making strange movements towards the floorboard. They're just sitting there calmly. And then I think instead of, you know, we don't have testimony that he just tried to shield his eyes. He really is. He's ducking down. And in the officer's experience, that could mean he's hiding. He's trying to hide something. He's trying to hide a gun. He's trying to hide drugs because he knows the police are coming to talk to him. So, yes, you know, I agree that it is certainly susceptible to an innocent explanation. But reasonable suspicion says we we look at those. We don't have to we don't have to eliminate every innocent explanation. We're allowed to say, OK, that that was kind of sketchy. And then, like, let's put it in the broader context here, which is it's it's very late at night. It's a it's an area known for drug deals. There's all these other factors. And we have this man who looks like he's trying he's trying to sort of evade contact with the police. That, I think, gets us across the line. Mr. Let me probe that a little bit. Now, your argument to us is seems to me quite different than the argument that the government made in response to the motion to suppress, because in the response to the motion to suppress in district court, the government's brief said, I think it's on page thirty seven of the record that the office officer Moran saw the people dispersing and saw the furtive movements as he walked toward the vehicle. Now, as he walked toward the vehicle, I think you've acknowledged on appeal that he had already been seized because obviously the tracks couldn't go anywhere. And so is your argument not inconsistent with what the government had argued in district court? In other words, that officer Moran, you say, saw the furtive movements and the pedestrians move when he entered the parking lot. But that's not what your colleague said in district court. I don't think they're consistent, Your Honor. I think that's just a factual detail that developed as the case progressed. I suspect that that briefing was based on the officer's written reports where they do flag that the furtive movements were fairly noticeable when they were walking towards the car. And that was after the police officer's car was parked right in front of them with the headlights right on top of them. Yes, that's correct, Your Honor. So you think nobody is arguing they saw furtive movements as the police officers were driving in to the parking lot and before they had positioned their car and headlights on the suspect car? We are absolutely arguing that that's when they saw the furtive movements. There's testimony to that effect from both of the officers. You're saying they saw the furtive movements before they positioned themselves in front of the car? Yes. And how did the district court rule on that? Because I thought the evidence was kind of unclear on that. So that brings up the issue of preservation, which is that it's not clear whether we really have a ruling from the district court on this because the defendant didn't raise this claim below. And that is why it should be found forfeited or waived on appeal or at the very least subject to plain error. What argument did they waive specifically when the furtive movements were observed? That's the point that you say? I think the argument that they should have made below and could have made below and failed to make below was that the stop occurred when the Chevy tracks were blocked in and the officers did not witness those furtive movements until after the stop had occurred and therefore they were not relevant to the analysis. That's not a claim that was ever brought to the district court's attention. But you haven't argued that on appeal, have you? Yes, we have, Your Honor. That he forfeited the argument that he had already been seized at the time that Officer Moran detected the furtive movements and the dispersion? Yes, Your Honor. I can provide citations to my answer brief, but yes, we firmly have argued that. But only in your answer? You didn't in your answer brief say that? That this argument was waived? Yes. Okay. If it's helpful, I'm happy to provide the citation. That's all right. Did you have a question? No. The district court actually said both things, right? The district court, as I recall, and I don't have it in front of me, but my recollection is the district court said that Officer Moran saw the furtive movements and the dispersion when he put his flashlight on the car, on the tracks. And he also said it was when they had the spotlights on the car when they came in, right? That is not my interpretation of the opinion below. I think the district court, it makes it very clear in both sentences where it's talking about when the officers observed the furtive movements. It's as they approached in their police vehicle. And that was the testimony that the officers gave at the hearing as well. When did they see them? The prosecutor is very clear to ask, were you still inside the car? When was this happening? It was as they were pulling into the parking lot. That is the testimony they gave. And I do acknowledge that there are some certain variances in what was said and when. But I ultimately believe that that is a question for the fact finder and one that ultimately was resolved in the officer's favor. And that credibility finding is due significant damage. What specifically did the district court say as to when the furtive movements were observed? It says as they approached. This is the district court's findings of fact? Yes. It's on page 84 of volume one of the record. So it discusses the officers getting out of the car. And then it says earlier as they approach the tracks in the police car, officers Moran and heard saw two women in the front seat of the tracks and one person in the rear seat as they approached in the police car. The police officers saw the rear passenger trying to crouch down and duck between the seats as if trying to hide from the officers. So I think the repeated use of that phrase in the police car is emphasizing there to the extent that the district court said anything about this, that the officers observed this these movements before they got out of the car and before the stop occurred. When do you think the stop occurred? I think that is an interesting question that is also goes to the waiver argument, which is that it truly was not brought up below. But I believe I think I would say that the stop happens probably when the officers park the car and it's clear that they're not maybe just doing some sort of temporary maneuver that's not going to block the car in. But that they really are not moving and the occupants of the car are not free to leave. But again, I think that this is why it's very difficult for Mr. Jackson to prevail on this argument, because this is something that the district, this is a factual question. The question of when the stop again is probably a mixed question of fact and law, but it's one that should have been put to the district court. If this issue of timing were so important, we would have had the district court saying, OK, there is a question here of when the stop began. And there's also a question here of when these men observed the furtive movements, and I'm going to make findings to that specific effect. I have trouble thinking the stop occurred when the police officers parked the car in front of the other car that might have restrained the driver or the owner of the car would be reluctant to flee and leave his vehicle or her vehicle there. But the guy in the backseat was a passenger, and I don't see how he was constrained at all. Just because somebody else's car movement was restrained. It's hard for me to see that he was arrested until he personally was taken into custody because he, in fact, tried to exercise his freedom of movement by getting out. I believe he was. I believe he was asked to step out of the car. But, I mean, that but but he my point is simply I don't see how he would have been restrained until the police officers focused on him specifically. I think that is an interesting point again is that perhaps the stop with respect to Mr Jackson didn't begin until maybe the police officer walked up to the window and made clear that he was not going to allow him to exit the car. Or perhaps when he asked him to step out of the car, that showing of authority. But I think that really only strengthens the government's arguments there, because then it really it doesn't matter when the officers observed the furtive moments because everyone agrees that they happened before the officer approached Mr Jackson and began speaking with him. Let me let me go back to the preservation. How is Mr Lowman? How can we characterize his change of position as a lack of preservation when the government explicitly changed its position? You know, you indicated that, well, the government, your colleague in district court said this based on the officer's statement. Of course, that's prominently displayed in his argument that this testimony contradicted the officer's statement and the lack of this these references in both of the officers probable cause statements. But so in in the officer's statements, they say, well, the furtive movements, the dispersion were were detected when Officer Moran went to the vehicle. And then and so he doesn't know that now the government in the hearing is going to present testimony that is diametrically different than that, that Officer Moran is now going to say for the first time. No, I also saw it when I pulled into the parking lot. And so if the government changes its position, how do we fault Mr Lowman for changing his position? So I guess two responses to that, Your Honor. One, I would argue that the government didn't change its position. That's just the nature of how these facts develop. You know, our prosecutor is is looking at the written report. And then they're also asking questions in a live hearing where the officers are being being allowed to answer more specifically. Right. So that was when we developed it. That was when it became clear. Right. These officers are not they're not lawyers. They're not sitting there saying, OK, what do I need to justify this? Terry stop. And when did that stop again? They're saying, what do I remember? And when it's the prosecutor who sits there and says, OK, but when do you remember seeing it? That's development. And so I think I would disagree that that's a change of position, especially because also, you know, you can preserve things by making them at the suppression motion hearing. Right. And so that is those were all facts that were brought to the district court's attention. And the problem with Mr Lowman's argument is that this argument was not brought to the district court's attention. So he would have had to bring it not as Rule 12 contemplates in the in the motion to suppress because it wasn't of it wasn't judiciable at that time. So he would have had to have brought it up orally in the hearing itself. But there was space for argument at the hearing. Both sides were allowed to present on that. And I think that is, you know, it's something that could have been developed through cross-examination. It's something that should have been brought up at the argument. It's something that the district court should have been given an opportunity to rule on. Otherwise, it puts us in this very difficult position of trying to figure out this factual question without being the fact finder. The court has no further questions. I will ask you to affirm. Thank you. Thank you. Your Honor, very briefly, I want to address the this waiver argument, the argument that we have not preserved when these furtive movements were allegedly witnessed. Mr. Judge, you were spot on. The issue here is that the government's position has been ever evolving throughout this proceeding. And even at the suppression hearing, we have testimony from two different officers who put that when these furtive gestures occurred at different times. And so I want to take a step back. Our position going into this suppression hearing was that officers did not have reasonable suspicion at the time the stop occurred. And we argue that the stop occurred when the Chevy Trax was blocked in. Counsel, let me ask you a question. I'm confused on this. Are you suggesting that if officers see somebody in the middle of the night in a high crime area parked with people around the car where they know drug activity is going on, that they can't do anything? No, they can. They can certainly do something. What can they do? Can they pull up to look at the person and see what's going on? I would suggest that the officers could have done what they claimed to have done in their report. They claimed throughout the report that this was a consensual encounter. There were plenty of parking spaces immediately next to... Well, what difference does it make that there's plenty of parking spaces? Are you saying that they did not have the right to go up to that car to see whether or not there was a drug deal going on? No. Middle of the night, high crime area, lots of drugs in the area. They have to find another parking space and the guy could drive off. And since they didn't see anything because they hadn't gotten close enough, that's just too bad. Is that your position? I don't know that I would quite say it that way, but that is our position, Your Honor. The officers described this as a consensual encounter. That's what they claimed throughout most of this proceeding up until the very end where they changed their position. But they claimed that they were doing a consensual... Well, I just want to know what your position is. Our position, Your Honor, would be that they should have... Oh, I'm sorry. I'm almost out of time. You can answer. Our position would be that, if anything, they should have had a consensual encounter. They could have not blocked in the tracks and simply not pulled right up on him with their headlights and spotlights on and conducted a consensual encounter. They could have parked somewhere else and walked up in a way that doesn't show authority. Did the car go off at the sale of E? Yes, Your Honor, that's the case. Okay, thank you. That answers my question. Isn't the headlights justifiable in terms of officer safety? I mean, we give some considerable slack to the way an officer conducts a stop to protect that officer's safety. And wouldn't a reasonable officer say, I don't know what's going on in that car. It's dark in there, and I better illuminate things before I get out of my car and expose my body to whatever is in there? Well, Your Honor, even in that case, still blocking in the tracks. They could have still parked further back in a way where they're not three feet away from this car blocking it in. I would submit, as the district court found, that parking that close with the spotlights is a show of authority that would be a stop. All right, thank you, counsel. This matter is submitted. I do want to express appreciation to both Mr. Lohman and Ms. Miller about your briefs and your arguments today were excellent. Thank you.